AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
JAN- 9 2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___rsm___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
01/09/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

United States of America

v.

JUAN TORRES EUDAVE and FELIX MARTIN VILLANUEVA SANCHEZ,
Defendants

Case No. 2:25-mj-00074-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 7, 2025 in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Special Agent Geovanni Cuevas, HSI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: Jan. 9, 2025

Karen L. Stevenson
Judge's signature

City and state: Los Angeles, California

Hon. Karen L. Stevenson, U.S. Chief Magistrate Judge
Printed name and title

AUSA: Matt Coe-Odess (x8957)

## AFFIDAVIT

I, Geovanni Cuevas, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been since January 2024. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. In the course of my work, I have conducted physical surveillance, executed search warrants, reviewed electronic records, and investigated violations of federal law.

2. I have a bachelor's degree in Homeland Security from American Military University. I was a Security Forces Officer in the United States Air Force for approximately four years. During that time, I worked as patrol officer, field training officer, armorer, and response force leader. I have completed approximately 500 hours of instruction from the Federal Law Enforcement Training Center, resulting in a certificate of completion from the Criminal Investigator Training Program ("CITP"). I have also completed approximately 500 hours of HSI related instruction from the Federal Law Enforcement Training Center, resulting in a certificate of completion from the Homeland Security Investigations Special Agent Training program. Lastly, I've investigated various drug-related crimes since August 2024.

## II. **PURPOSE OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint and arrest warrants against Juan Torres Eudave ("TORRES") and Felix Martin Villanueva Sanchez ("VILLANUEVA") for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

4. This affidavit is also made in support of a warrant to search the following digital devices (the "SUBJECT DEVICES"), currently in the custody of Homeland Security Investigations Riverside Inland Empire Border Enforcement Security Team in Riverside, California, as described more fully in Attachment A:

    a. a dark blue Apple iPhone with a black border with phone number ending in 1625, seized from TORRES on January 8, 2025 ("SUBJECT DEVICE 1"); and

    b. a white Apple iPhone with a black case with the phone number ending in 8126, seized from VILLANUEVA on January 8, 2025, and ("SUBJECT DEVICE 2").

5. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. SUMMARY OF PROBABLE CAUSE

7.   On the night of January 7, 2025, TORRES drove to the San Ysidro border and attempted to enter the United States.  At the border, a drug detection dog alerted to narcotic odors coming from TORRES's vehicle ("V-1").  A secondary X-Ray inspection revealed anomalies in the panels of the V-1, consistent with drug smuggling.  Customs and Border Protection Officers ("CBPO") and HSI allowed TORRES to enter the United States, and HSI followed TORRES in V-1 north while maintaining visual contact with V-1.

8.   At around 11:30 p.m., TORRES parked V-1 in an empty Walgreens parking lot in La Puente, California.  A second vehicle ("V-2") entered the parking lot and parked next to V-1, and after about a minute, both vehicles exited the parking lot, with V-1 following V-2, to a different small parking lot about one block away.  TORRES and the driver of V-2, later identified as VILLANUEVA, appeared to shine a light inside the driver-side rear of V-1, where the X-Ray operator had identified anomalies.

VILLANUEVA retrieved two weighted white plastic bags out of V-1 and placed them in a third vehicle nearby ("V-3").

9. HSI then arrested TORRES and VILLANUEVA for drug trafficking. VILLANUEVA provided oral and written consent for law enforcement to search V-2 and V-3. In the trunk area of V-3, law enforcement found the two weighted white plastic bags, which contained approximately 29.29 kilograms of what field-tested positive for methamphetamine. SUBJECT DEVICE 1 was seized from TORRES, and SUBJECT DEVICE 2 was seized from VILLANUEVA.

10. In a Mirandized interview, VILLANUEVA admitted that he placed two white plastic bags in V-3 (which was registered in his name) and that someone else was supposed to pick up the bags from V-3. VALLANUEVA said that he would be paid for facilitating the transfer of the bags and that he was previously paid $1,000 for facilitating a similar transfer.

## IV. STATEMENT OF PROBABLE CAUSE

11. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following.

   **A. A Drug-Trained Canine Alerts to Narcotics Inside of TORRES' Vehicle at San Ysidro Border**

12. According to CBPO Christopher Calle, on January 7, 2025, at approximately 8:30 p.m., TORRES drove to the San Ysidro border and attempted to enter the United States from Tijuana, Mexico. TORRES was driving a Honda Accord ("V-1"), which was

registered in his name according to a law enforcement database. TORRES was the sole occupant in the car.

14. CBPO Christopher Calle asked TORRES standard entry questions, including whether TORRES was the only person with access to his vehicle and whether TORRES maintained constant visual of his vehicle while in Mexico. TORRES responded "yes" to both questions.

14. Led by CBPO Canine Handler Daniel Howard, a trained drug detection dog sniffed the vehicle for the presence of drugs and alerted to narcotic odors near the back of the passenger side rear seat and the quarter panel of V-1.

### B. CPBO Find Anomalies Inside of TORRES' Vehicle

15. CPBO conducted a secondary inspection of V-1 by using an X-Ray machine. The X-Ray operator detected anomalies in the rear quarter panels of the vehicle as depicted below:



16.  CBPO informed the HSI San Diego Narcotics Enforcement Team ("SDNET") of the anomalies in V-1.  CBPO and SDNET did not disclose any findings to TORRES but rather allowed TORRES to enter the United States.  SDNET conducted mobile surveillance of TORRES as he drove in V-1.  At all relevant times, SDNET followed and maintained visual contact with V-1.

    **C.**    **TORRES Appears to Conduct Counter-Surveillance**

17.  During the course of conducting mobile surveillance, SDNET observed TORRES drive northbound on the I-5 highway; exit the I-5 North; enter the I-5 South; drive south; exit the I-5 South; enter the I-5 North again and continue to drive northbound.  Based on my training and experience, this driving pattern is consistent with conducting counter-surveillance activities by individuals seeking to avoid law enforcement detection.

    **D.**    **TORRES Meets a Second Vehicle in a Parking Lot and Follows the Vehicle to a Nearby Location**

18.  I, along with other agents of HSI Riverside Inland Empire Border Enforcement Security Team ("IE BEST"), joined SDNET in conducting mobile surveillance of TORRES as he headed northbound towards West Covina, CA.  IE BEST and SDNET (collectively "HSI") continued to maintain visual contact with V-1.

19.  At around 11:20 p.m., HSI saw TORRES enter an empty Walgreens parking lot located in La Puente, California.

20.  Shortly after TORRES parked, HSI saw a second vehicle, a Nissan Sentra ("V-2"), enter the parking lot and park next to

V-1. After about a minute, both vehicles exited the parking lot, with V-1 following V-2.

21. HSI saw both vehicles drive about one block away to a nearby side street. Both vehicles parked in a small parking lot in front of a spa business.

### E. TORRES and VILLANUEVA Retrieve Weighted Plastic Bags from V-1 and Load Them into V-3

22. HSI saw the driver of V-2, later identified as VILLANUEVA, step out of his vehicle and approach V-1. HSI saw TORRES get out of V-1. HSI saw VILLANUEA and TORRES appear to shine a light inside the driver-side rear of V-1. HSI then saw VILLANUEVA retrieve two weighted white plastic bags out of V-1.

23. HSI saw the driver of V-2 (later identified as VILLANUEVA) unlock and approach a Dodge Durango ("V-3") that was parked nearby. VILLANUEVA placed the two weighted white plastic bags inside the trunk area of V-3. HSI later learned that V-3 was registered to VILLANUEVA.

### F. HSI Finds 29.29 Kilograms of Methamphetamine in V-3

24. HSI placed TORRES and VILLANUEVA under arrest for drug trafficking. I spoke to VILLANUEVA, who provided oral and written consent for law enforcement to search V-2 and V-3. In the trunk area of V-3, law enforcement found what appeared to be the same two white plastic bags that they had just seen VILLANUEVA transfer from V-1 to V-3. They also recovered the SUBJECT DEVICES, namely, a dark blue Apple iPhone with a black border with the phone number ending in 1625, seized from TORRES on January 8, 2025 ("SUBJECT DEVICE 1"), and a white Apple

7

iPhone with a black case with phone number ending in 8126, seized from VILLANUEVA on January 8, 2025 ("SUBJECT DEVICE 2").

25.  The two bags contained a total of approximately 29.29 kilograms of suspected methamphetamine.  HSI field tested the substance inside the bags, which tested positive for methamphetamine.

### G.   VILLANUEVA Admits Placing Bags Into V-3 for Money

26.  HSI SA Michael Luna and SA Timothy Pike interviewed VILLANUEVA at the West Covina Police Department.  After being advised of his Miranda Rights and signing a Rights Advisement form, VILLANUEVA admitted that he placed two white plastic bags in his Dodge Durango (V-3) and that someone else was supposed to pick up the bags from V-3.  VALLANUEVA said he understood that he would be paid for facilitating the transfer of the bags and that he was previously paid $1,000 for facilitating a similar transfer.[1]  VILLANUEVA also confirmed that SUBJECT DEVICE 2 was his phone.

### VII. TRAINING AND EXPERIENCE ON DRUG OFFENSES

27.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

28.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both

---

[1] TORRES invoked his Miranda rights.

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

29. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

30. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

31. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.  Forensic methods may uncover electronic files or been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

      e. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      f. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      g.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

34. For all of the reasons described above, I submit that there is probable cause to believe that TORRES and VILLANUEVA committed violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Controlled Substances.

35. I further submit that there is probable cause to believe that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found in the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 9th day of
January, 2025.

*Karen L. Stevenson*
_____
HON. KAREN L. STEVENSON
CHIEF UNITED STATES MAGISTRATE
JUDGE